**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

UNITED STATES OF AMERICA

v.                                          CASE NO.  5:17cr32-RH

AMANDA GIOVANNI,

       Defendant.

_____/

**ORDER DENYING THE MOTION TO
SUPPRESS ALICIA-COURT STATEMENTS**

    This case presents a recurring question: is a person in custody for purposes

of *Miranda v. Arizona*, 384 U.S. 436 (1966), when the person's liberty is

substantially curtailed within the person's home while multiple officers execute a

search warrant. The answer: sometimes yes, sometimes no. Here the answer is no.

## I. Background

    A 23-count indictment charges the defendant Amanda Giovanni and two

others with offenses arising in part from Ms. Giovanni's fraudulent claims about

her authority to sell arms to the Kurds. Ms. Giovanni has filed a motion to suppress

statements she made in response to questioning by officers while a search of her

home was being conducted pursuant to a warrant. The home was in Virginia on

Alicia Court. This order sets out the court's findings of fact and conclusions of law following an evidentiary hearing.

## II. Findings of Fact

At about 7:00 a.m. on January 11, 2017, roughly 20 officers arrived at the two-story townhome where Ms. Giovanni lived. They intended to execute a valid search warrant. The case agent, Lawrence Borghini, placed two calls to each of two mobile telephone numbers he had for Ms. Giovanni—a total of four calls— intending to advise her of the officers' arrival. She did not answer. The search team approached the front door. An officer knocked loudly and announced the officers' presence, then repeated the process. When the door was not answered within roughly 30 seconds after the first knock, an officer breached the door with a battering ram, damaging the frame.

Two officers entered the foyer with guns drawn and loudly instructed anyone in the home to come to the officers. As it turns out, three people were in the home: Ms. Giovanni and two guests, the Shallal brothers. The Shallal brothers left their separate rooms and came downstairs to the officers. Ms. Giovanni left her own room moments later and also came downstairs. As the three occupants came downstairs, the officers' guns were still in hand and at the ready. The occupants complied fully with the officers' instructions from that point forward.

As the occupants came down, they were handcuffed and taken outside. It may have recently snowed; in any event, it was cold—not more than 40 degrees. Ms. Giovanni was wearing a nightshirt and pants of some sort with no shoes. She was kept apart from the Shallals. An officer brought shoes down to her and allowed her to sit in the back of an officer's car, with the door open, to put them on. Ms. Giovanni and the Shallals were kept outside for 15 to 20 minutes while officers cleared the residence. Officers then escorted them back inside, maintaining the separation between Ms. Giovanni and the Shallals.

Mr. Borghini spoke to Ms. Giovanni in the foyer and escorted her into the living room, allowing her to sit in what appeared to be a comfortable chair. He sat nearby, as did the other case agent, Christopher Pekerol. Mr. Borghini told Ms. Giovanni that she was not under arrest, that she was free to leave, that if she left she would be unable to return while the search was in progress, that he and Mr. Pekerol would like to talk with her if she wished to talk, and that she did not need to talk with the agents or answer any questions. Mr. Borghini did not advise Ms. Giovanni of her *Miranda* rights, did not mention her right to call an attorney, and did not indicate that if she chose to answer questions, she could stop answering at any time.

Ms. Giovanni chose to answer questions. She did this voluntarily; she *wanted* to talk her way out of any trouble. The tone of the interview was usually

conversational, with voices raised only occasionally and only a little. Aside from the circumstances—"other than that, Mrs. Lincoln, how was the show?"—there was nothing coercive about the discussion.

Ms. Giovanni was not allowed to talk with the Shallals, who were attended by officers in other parts of the residence. Ms. Giovanni was allowed to go to the restroom, but only with a female officer in attendance. Ms. Giovanni was not allowed to go upstairs to shower, brush her teeth, or change clothes, but a female officer may have gone upstairs with Ms. Giovanni so that she could get a bra—and put it on in the officer's presence. Ms. Giovanni was allowed to get a cup of coffee from the kitchen while accompanied by an officer. Ms. Giovanni was allowed to smoke, initially in the living room with a window open, but when the room became smoky, she was allowed to go outside to smoke, accompanied by an officer.

After perhaps two hours of questions and answers, Ms. Giovanni asked to call her lawyer. She was not allowed access to her phone—it had been seized pursuant to the warrant—but Mr. Borghini dialed the number on his own phone and handed it to Ms. Giovanni. She talked with her attorney with officers nearby but not close enough to hear what was said. On the attorney's advice, Ms. Giovanni told Mr. Borghini she did not wish to answer further questions. He immediately acquiesced, making no effort to question her further.

Ms. Giovanni remained at the home until officers finished the search in the middle of the afternoon. The officers left without making an arrest. At that point Ms. Giovanni was back in control of her home and her movements.

## III. Credibility Determinations

The findings recounted in section II are based partly on undisputed evidence, partly on credibility determinations resolving disputes in the evidence, and partly on reasonable inferences. The credibility determinations include the following.

First, I credit Mr. Borghini's testimony, though I find that he was mistaken in at least one respect: he testified that he advised Ms. Giovanni twice or more that she was free to leave. I find that he so advised her only once—and that he advised her only once that she did not have to speak with the agents or answer questions. That is consistent with Mr. Pekerol's testimony. It is possible that Mr. Borghini so advised Ms. Giovanni another time when Mr. Pekerol was not present, but my finding is that Mr. Borghini is simply mistaken about this.

Second, I credit Mr. Pekerol's testimony.

Third, I credit Ms. Giovanni's testimony in part but do not credit it in part. She testified she was wearing only a see-through shirt and no bra. I do not credit the statement that her shirt was see-through. I do not credit her testimony about how long she was outside or how she was treated outside. I do not credit her testimony that she was not asked about the underlying transactions; to the contrary,

asking about those transactions was the whole point of the interview. I do not

credit her testimony about the overall tone of the interview. And to the extent not

included in the findings in section II, I do not credit any other testimony of Ms.

Giovanni that was contradicted by other evidence.

I credit Mr. Shallal's testimony only to the extent consistent with the

findings in section II.

## IV. Conclusions of Law

### A. Miranda Principles

With exceptions not at issue here, *Miranda* prohibits the government from

introducing a statement made by a person in custody in response to questioning by

a law enforcement officer unless, before the statement, an officer gave the familiar

*Miranda* warnings. The warnings were not given here. As the government

acknowledges, Ms. Giovanni's motion to suppress statements she made while

being questioned during the search must be granted—the statements cannot be

admitted by the government other than to impeach any contrary statements Ms.

Giovanni might make while testifying—unless, as the government contends, she

was not in custody when questioned.

A person is seized when a reasonable person would not feel free to leave or

terminate a police encounter. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429 (1991).

But this does not resolve the custody issue; for *Miranda* purposes, a person is not

in custody merely because the person has been seized. The Eleventh Circuit so held in *United States v. Luna-Encinas*, 603 F.3d 876 (11th Cir. 2010). There the court said a person had been seized while his residence was being searched—the person was not free to leave or terminate the encounter—but the person was not in custody. This followed an explicit statement to the same effect in *United States v. Street*, 472 F.3d 1298, 1309-10 (11th Cir. 2006): "a seizure does not necessarily constitute custody for *Miranda* purposes."

*Luna-Encinas* and *Street* relied on *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). There the court said the *Miranda* custody issue raises two questions. The first is whether a reasonable person "would have thought he was free to leave the police encounter at issue"—that is, whether the person had been seized. *Id*. at 672. If the answer is yes, the inquiry is at an end; *Miranda* warnings were not required. But if the answer is no, "additional analysis is required because . . . not every seizure constitutes custody for purposes of *Miranda*." *Id*.

The required additional analysis is the second question: "whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id*. This language—a "degree associated with a formal arrest"—derives from Supreme Court decisions. *See Stansbury v. California*, 511 U.S. 318, 322 (1994); *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also United States*

*v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting this language from *Beheler*). Indeed, *Stansbury* says "the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (bracketing and internal quotations omitted).

## B. Eleventh Circuit on Questioning During Home Searches

The government has prevailed in the Eleventh Circuit cases applying these principles to questioning in a person's residence during a search. But in each case the facts were significantly different than here.

In *Luna-Encinas*, officers made a controlled delivery of a Federal Express package containing drugs to a townhouse. A person signed for the package but eluded officers. A bystander told officers the person fled into the next-door townhouse—the one in which, as it turned out, the defendant resided. Officers with guns drawn came upon the defendant outside his townhouse but spoke to him only briefly. Another resident of that townhouse gave officers consent to enter to search for the fleeing suspect. While inside, officers found a gun box but no gun. When officers were told the gun box belonged to the defendant, the officers went back outside and questioned the defendant without providing *Miranda* warnings. Affirming the district court's denial of a motion to suppress, the Eleventh Circuit said the defendant had been seized—he was not free to leave or terminate the

encounter, and a reasonable person in his position would have understood this—but the court held the defendant was not in custody for *Miranda* purposes.

*Luna-Encinas* confirms the governing standard—not whether the person has been seized, but whether there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Beyond that, the case is not much help here; there was only a brief detention during a consent search with few of the additional factors that confronted Ms. Giovanni. Still, in *Luna-Encinas* the officers had guns drawn when they first encountered the defendant, and the officers never told the defendant he was free to leave. If nothing else, *Luna-Encinas* is controlling authority in this circuit for the proposition that a person who has been confronted with drawn weapons and later seized—without being told he is free to leave—is not, based on those circumstances alone, in custody.

Similarly, in *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006), multiple officers questioned the defendant in his home. They arrived not to conduct a search but to question the defendant about a bank robbery. With no *Miranda* warnings, the defendant agreed to talk with the officers, and the defendant consented to a search of his home and car. The district court denied a motion to suppress the defendant's statements. The Eleventh Circuit affirmed. Like in *Luna-Encinas*, the court said seizure and custody for *Miranda* purposes are different, citing *Newton*, and the court said the defendant was not in custody when

questioned. But again, the circumstances were markedly different than those that confronted Ms. Giovanni.

Closer factually is *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), which, unlike *Luna-Encinas* and *Street*, involved a search warrant. Seven officers arrived to execute a search warrant at the home of a woman with whom the defendant was in a relationship—a home where the defendant sometimes stayed. Some of the officers were armed. There was conflicting testimony, and apparently no clear finding, about whether the officers' weapons were drawn. The defendant answered the door and let the officers in. Officers told the defendant they were talking to everyone who had been present at a post office at the time of a murder they were investigating. Officers told the defendant repeatedly that he was free to leave and that he did not have to talk to the officers. But the officers did not give *Miranda* warnings. Officers allowed the defendant to move around the house, but only in an officer's presence. The defendant agreed to answer questions. The officers who questioned the defendant were not armed. Affirming the district court's denial of a motion to suppress, the Eleventh Circuit held that the defendant was not in custody.

*Brown* is not dispositive here because the defendant faced only some of the circumstances that confronted Ms. Giovanni. There were 7 officers, not 20, they apparently did not arrive at dawn, and the officers told the defendant repeatedly,

not just once, that he was free to leave and did not have to talk to the officers. Still, *Brown* held that the defendant had not been seized and that *Miranda* warnings thus were not required. *Brown* establishes, at least, that a person is not necessarily in custody when questioned in the person's own home while multiple officers execute a search warrant.

One other note about *Brown* is in order. *Brown* did not explicitly embrace the analysis that *Luna-Encinas* and *Street*, with their reliance on *Newton*, now make clear is controlling: if a person has been seized, there is a second *Miranda* inquiry, whether there has been a formal arrest or restraint on freedom of movement *to the degree associated with a formal arrest*. The court had no occasion to address this in *Brown* because the court held the defendant had not been seized.

The Eleventh Circuit also has ruled for the government in other cases, but never on facts quite like these. *See United States v. Stinson*, 659 F. App'x 534 (11th Cir. 2016); *United States v. Emanuel*, 440 F. App'x 881 (11th Cir. 2011).

In sum, the Eleventh Circuit has set out the governing principles but has not addressed the application of those principles to a case quite like this one.

## C. Other Circuits' Cases

Other circuits have addressed cases that are closer—some going each way, and none on all fours.

### *(1)  Defendant Not in Custody*

The best case for the government is perhaps *United States v. Faux*, 828 F.3d

130 (2d Cir. 2016). There 10 to 15 officers from three agencies arrived at the

defendant's house at dawn to execute a search warrant. The defendant and her

family were up, dressed, and loading the car to go on vacation. Officers

encountered the defendant's husband outside and were allowed inside without

having to knock. No weapons were drawn, but as the defendant correctly

suspected, the officers were armed. When the defendant volunteered a statement

about the conduct the officers were investigating, an officer "responded very

bluntly, very directly," showing that he disagreed. *Id*. at 133.

At the officers' request, the defendant agreed to answer questions. The

officers did not initially tell the defendant that she was free to leave or that she did

not have to talk with them. Some 20 minutes into the questioning, the officers did

tell the defendant she was "not under arrest."

The district court recounted the evidence but did not make findings resolving

significant disputes. One dispute was this: the defendant said an officer told her

right at the outset that she was not going anywhere; the officer denied making the

statement at all. Another dispute: the defendant said she asked an officer whether

she needed a lawyer and he answered "not yet"; the officer denied any mention of

a lawyer. A less important dispute was whether, while escorting the defendant, an

officer held her arm; the defendant said yes, but an officer said nobody touched her.

The district court granted the defendant's motion to suppress. Without remanding for factual findings, the Second Circuit held that the defendant was not in custody and that the motion to suppress thus should have been denied. Although the Second Circuit did not explicitly say so, its decision to resolve the issue outright, rather than to remand for findings on the factual disputes, necessarily meant the ruling would have been the same even if the disputes had been resolved in the defendant's favor—even if she was told at the outset that she was not going anywhere, even if she asked whether she needed a lawyer and was told not yet, and even if an officer held her arm while escorting her. If findings on these disputes would have made a difference, the proper disposition would have been a remand for further findings on the motion to suppress, not a final decision on the issue in favor of the government.

*Faux* is not identical to this case. Some circumstances here are more suggestive of custody than there; some are less suggestive of custody. In both cases multiple officers from multiple agencies showed up to execute a search warrant at dawn. In both cases officers questioned the defendant during the search without giving *Miranda* warnings.

Here there were more officers from more agencies—but in both cases there were plenty. In both cases officers arrived at dawn, but in *Faux*, by happenstance, the occupants of the home were awake, dressed, and on their way out; the officers entered the home without drawing their weapons or even having to knock. Here, in contrast, Ms. Giovanni was still in bed and did not answer her phone; officers broke open the door and entered with guns drawn. Perhaps because of this difference, in *Faux* the defendant remained in the home from the outset, while here Ms. Giovanni was handcuffed and taken outside—coincidentally in harsh conditions—while officers cleared the home.

On the other side, here an officer told Ms. Giovanni clearly at the outset that she was free to leave and did not have to answer questions; in *Faux* there was no similar statement. When Ms. Giovanni asked to call her lawyer, she was immediately allowed to do so; in *Faux* when the defendant asked about her lawyer, she was told, at least on her version of events, that she did not need to contact the lawyer. When Ms. Giovanni said she did not wish to answer further questions, the questioning stopped, with no push back; nothing of that kind happened in *Faux*.

The Second Circuit said in *Faux* that the agents "stepped right up to the limits of constitutionally permissible conduct and . . . just managed to toe the line." *Faux*, 828 F.3d at 132. If the agents managed to toe the line in *Faux*, they managed

to toe the line here. The differences in the facts of that case and this one are not enough to make a difference in the outcome.

Other circuits, too, have held that a defendant was not in custody during a search of the defendant's residence. For example, in *United States v. Williams*, 760 F.3d 811 (8th Cir. 2014), about seven agents executed a search warrant at the defendant's home. They entered with a battering ram while the defendant was not there. When the defendant arrived, an officer told him he was not under arrest and did not have to answer questions, but the officer did not give *Miranda* warnings. The district court granted a motion to suppress, but the Eighth Circuit reversed, holding that the defendant was not in custody. The Eighth Circuit reached the same result on similar facts in *United States v. Perrin*, 659 F.3d 718 (8th Cir. 2011), *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004), and *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002).

In *United States v. Hargrove*, 625 F.3d 170 (4th Cir. 2010), 10 to 15 officers executed a search warrant at the defendant's home at dawn. An officer told the defendant he was free to leave and was not under arrest, but the officer did not give *Miranda* warnings. The district court denied a motion to suppress, and the Fourth Circuit affirmed, holding that the defendant was not in custody.

Other cases—arranged by circuit—in which the government has prevailed, though on different facts or in unpublished opinions, include these: *United States v.*

*Familetti*, 878 F.3d 53, 60 (2d Cir. 2017); *United States v. Hinojosa*, 606 F.3d 875

(6th Cir. 2010); *United States v. Tummins*, 517 F. App'x 342 (6th Cir. 2013);

*United States v. Keith*, 440 F. App'x 503, 506-507 (7th Cir. 2011); and *United*

*States v. Busby*, 613 F. App'x 627 (9th Cir. 2015).

### (2) Defendant Not in Custody

There are also cases—perhaps more—on the other side.

An example is *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012).

Approximately 14 officers from four agencies arrived at the defendant's home at or

perhaps before dawn to execute a search warrant. The defendant's wife let them in.

Officers ran into the defendant's bedroom and handcuffed him as he was getting

out of bed. Officers separated the defendant from his wife and children and

eventually removed the handcuffs and took him to a separate room for questioning.

Officers advised the defendant this was a "non-custodial" interview, but they did

not explain what that meant.

Officers did not allow the defendant to move around the house. They told

the defendant he could get something to eat or drink. They allowed him to use the

restroom, but an officer stood outside the door and kept the defendant in sight as he

did so. Officers allowed the defendant to call his brother, who was his employer, to

report that he would not be at work on time. But the officers required the defendant

to hold the phone where they could hear the conversation. Officers questioned the defendant for at least an hour.

The district court granted the defendant's motion to suppress. The Fifth Circuit affirmed, concluding that a reasonable person in the defendant's position would not feel "at liberty to terminate the interrogation and leave." *Id*. at 195 (quoting *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011)).

What was said above about *Faux* is also true of *Cavazos*: the officers' treatment of the defendant there was not identical to the treatment of Ms. Giovanni here. Some circumstances here are more suggestive of custody than there; some are less suggestive of custody. In both cases multiple officers from multiple agencies showed up to execute a search warrant at dawn. In both cases officers questioned the defendant during the search without giving *Miranda* warnings.

One difference is that Ms. Giovanni was told more clearly that she was free to leave and did not have to answer questions. This is important. Even so, Ms. Giovanni, like the defendant in *Cavazos*, faced obstacles to leaving—probably greater obstacles for her than for him. It is likely that the court that decided *Cavazos* would reach the same result here.

Another example is *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013). There 15 to 30 state and federal officers arrived with a search warrant just after 9:00 a.m. at the house where the 19-year-old defendant lived with his parents. An

uncle opened the front door, and the officers streamed in. An officer awakened the defendant in his bedroom, pointing a gun at him. Officers took the defendant and the other family members outside, where it was "chilly," before "eventually" allowing them back inside. Officers did not allow the defendant's mother, who was recovering from brain surgery, to lie down as she requested. Officers did not allow family members to move around the house freely, instead accompanying them at all times. But the officers also told the family members, including the defendant, that they were not under arrest.

Two officers took the defendant to a storage room in the basement, where they questioned him for three hours without giving *Miranda* warnings. At the beginning of the questioning, the officers told the defendant he could leave at any time and did not have to answer questions. But during the questioning, as confirmed by an audio-recording, an officer made statements suggesting the defendant could *not* leave and that answers were mandatory.

Meanwhile, back upstairs, the defendant's mother asked officers three times for an attorney for the defendant, but they told her that the defendant was being questioned and that she could not see him or interrupt the interrogation. According to the mother, officers told her the defendant was under arrest.

The district court denied a motion to suppress, emphasizing that, as shown by the recording, the defendant was calm, forthcoming, and showed no hesitation

or nervousness. The Fourth Circuit reversed, holding that the defendant was in custody. The court said the defendant's demeanor made little difference. To the contrary, the governing standard is objective—based on what a reasonable person would believe in the circumstances, not what this defendant actually believed. In holding that a reasonable person in the defendant's position would have believed himself in custody, the Fourth Circuit emphasized that the defendant awoke at gunpoint to a "harrowing scene," with armed officers in control of the house and family members not allowed to move around freely. *Id*. at 284.

The circumstances in *Hashime*, like those in *Faux* and *Cavazos*, were not identical to the circumstances Ms. Giovanni faced. Some circumstances here are more suggestive of custody than there; some are less suggestive of custody. In *Hashime* the defendant was just 19 years old, a factor in the analysis. *See J.D.B. v. N. Carolina*, 131 S. Ct. 2394 (2011). Officers made statements suggesting answers were mandatory. And when the defendant's mother asked for an attorney, officers said no—a fact that is remarkable but of limited importance because the defendant did not know it. In any event, the Fourth Circuit focused less on these matters than the overall setting—a house controlled by multiple officers.

In *Hashime* the Fourth Circuit cited for other purposes but made no effort to distinguish its decision in *United States v. Hargrove*, 625 F.3d 170 (4th Cir. 2010). There, as noted above, the court held that the defendant was not in custody while

10 to 15 officers executed a search warrant at his home at dawn. It is likely, though by no means certain, that the *Hashime* panel would reach its same result here— would hold that Ms. Giovanni was in custody. But it is also likely that the *Hargrove* court would reach its same result here—and thus would hold that Ms. Giannini was *not* in custody. The Fourth Circuit decisions are a draw.

A third case resolving this issue in favor of a defendant is *United States v. Mittel-Carey*, 493 F.3d 36 (1st Cir. 2007). There eight officers arrived at the defendant's residence at dawn to execute a search warrant. The defendant's girlfriend let the officers in. Two officers, one with his gun drawn, found the defendant in his bedroom. The officers allowed the defendant to dress, kept him separate from his girlfriend, and took him to the dining room to talk.

Officers did not give *Miranda* warnings. An officer told the defendant he did not have to talk but said that, in the officer's experience, individuals who cooperated from the outset tended to do better. The defendant asked whether he should have an attorney; the officer said he could not provide advice on this but added that, while the defendant had a right to an attorney, an attorney would just tell the defendant not to talk to officers. The officer told the defendant that the federal sentencing guidelines provided a reduction for acceptance of responsibility, and the officer said that based on the expected outcome of the search, the

defendant was "looking at a lot of jail time." *Id*. at 38. Officers proceeded to question the defendant for between 90 minutes and two hours.

The district court granted the defendant's motion to suppress. The First Circuit affirmed, citing six facts as "dispositive": (1) the early hour; (2) the number of officers; (3) the officer's unholstered gun when the defendant was first contacted; (4) the officers' physical control of the defendant at all times; (5) the length of the interrogation; and (6) the officers' coercive statements. *Id*. at 40. Only the sixth of those facts distinguishes Ms. Giovanni's case; for the first five, Ms. Giovanni faced circumstances as indicative of custody—and sometimes more indicative of custody—than the defendant in *Mittel-Carey*.

Still, the distinction concerning the sixth fact is important. Here, unlike in *Mittel-Carey*, officers made no promises, offered no inducements for choosing to answer questions, and allowed Ms. Giovanni to call her attorney immediately upon request.

Another First Circuit decision upholding the suppression of statements made without *Miranda* warnings during execution of a search warrant at the defendant's home is *United States v. Rogers*, 659 F.3d 74, 79 (1st Cir. 2011) (Souter, J.). The case involved fewer officers and different circumstances. The decision is perhaps less helpful here because the defendant was a sailor whose presence at the house

was arranged through a superior officer's order and questioning was conducted in the presence of an officer from the Naval Criminal Investigative Service.

Like the First, Fourth, and Fifth Circuits in the cases just discussed, the Seventh, Ninth, and Tenth Circuits also have held that a defendant was in custody while questioned at home during execution of a search warrant. The decisions—arranged by circuit—include these: *United States v. Borostowski*, 775 F.3d 851 (7th Cir. 2014); *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008); and *United States v. Revels*, 510 F.3d 1269 (10th Cir. 2007).

In sum, there is no shortage of cases from other circuits holding that a defendant was in custody while questioned at the defendant's residence during execution of a search warrant.

### D. Application to This Case

When officers execute a search warrant, a primary concern is safety. Deterring resistance is almost always better than successfully responding to resistance. One means of deterring resistance is an overwhelming show of force. Another means of deterring resistance is executing a warrant at dawn. It is not happenstance that in many of the reported decisions, a large number of officers arrived at dawn, often with guns drawn or at the ready.

To prevent the destruction of evidence, and more importantly to promote safety, officers often control the movement of a home's occupants during

execution of a search warrant. Indeed, officers ordinarily have authority to detain an occupant—forbidding the occupant to leave—while a search is conducted. *See Michigan v. Summers*, 452 U.S. 692 (1981). It is not happenstance that in many of the reported decisions, officers prevented occupants from moving freely around the home during execution of a warrant.

That these are reasonable and indeed standard practices says little about whether an occupant is in custody during a search. Unless the reason for a show of force and restriction on movement is explained, a reasonable occupant—the perspective from which custody is determined—knows only that force has been shown and movement restricted.

Ms. Giovanni knew officers entered her home with guns drawn and ready for use as she heeded the demand to come to the officers. She knew that the officers made an overwhelming show of force and took absolute control of the home. She was told she was free to leave, but she had had no opportunity to shower or brush her teeth or dress properly, and she was told that if she left she would be unable to come back until the search was concluded. A reasonable person would not view this as a meaning opportunity to leave. Moreover, a reasonable person in these circumstances would almost surely wish to stay rather than to cede full, unfettered possession to the officers.

The Eleventh Circuit's decision in *Brown* provides some support for the view that Ms. Giovanni was not seized. The better view, though, is that she was seized. That officers arrived at dawn and did not allow Ms. Giovanni to shower, brush her teeth, or dress properly is enough to distinguish *Brown*, even without regard to the other differences in the cases.

This does not, however, end the inquiry. The "ultimate inquiry" is not whether Ms. Giovanni was seized but whether a reasonable person in her position would understand that she was the subject of "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (bracketing and internal quotations omitted). As the Eleventh Circuit made clear in *Luna-Encinas* and *Street*, this requires more than just seizure. Those decisions provide some support, though perhaps not much, for the view that Ms. Giovanni was not in custody.

The issue is close. Here, as in *Faux*, the officers "stepped right up to the limits." *Faux*, 828 F.3d at 132. But an officer told Ms. Giovanni in clear terms that she did not have to answer questions. The officers reasonably took actions to promote officer safety but did nothing to gratuitously increase the pressure on Ms. Giovanni to answer questions. And while the issue is what a reasonable person would have understood during questioning—so that what Ms. Giovanni actually believed and what happened later have only limited relevance—it is significant that

Ms. Giovanni plainly understood she could ask to call her attorney and that, when she did so, the officer made a phone available, allowed her to call, and immediately honored the resulting request to end the questioning. That Ms. Giovanni actually understood she could ask for an attorney and stop the questioning provides at least some support for the proposition that a reasonable person, too, would have understood this.

On balance, the better view is that Ms. Giovanni had been seized but was not in custody—her freedom of movement had not been restricted *to the degree associated with a formal arrest*. This conclusion accords with the principles underlying *Miranda*. Coercive interrogation violates the Fifth Amendment and too often produces false confessions. *Miranda* warnings reduce the risk of coercion. But *Miranda*'s goal is not to deprive officers of the ability to take uncoerced statements—even uncoerced statements that a defendant might be wise not to make. So long as the Fifth Amendment and other relevant restrictions are properly followed, the law's usual preference for every person's evidence applies to the target of an investigation. There is no reason to believe officers coerced Ms. Giovanni to answer their questions. Because the officers did not violate *Miranda*, her statements are admissible.

This ruling of course does not limit Ms. Giovanni's ability to challenge at trial the government's evidence about the substance of her statements and the

circumstances under which they were made, including the officers' decision not to record the statements. *See* UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT, PATTERN JURY INSTRS. (CRIM.) S2.1 (2016 ed.) (citing *United States v. Clemons*, 32 F.3d 1504, 1510 (11th Cir. 1994).

## V.  Conclusion

For these reasons,

IT IS ORDERED:

The defendant's motion to suppress her Alicia Court statements, part of ECF No. 74, is denied.

SO ORDERED on June 2, 2018.

s/Robert L. Hinkle_____
United States District Judge
